WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

United States of America,

                Plaintiff,

v.

Eduardo Sosa,

                Defendant.

No. CR-15-0313-TUC-RM (BGM)

**REPORT AND RECOMMENDATION**

       Currently pending before the Court is Defendant Eduardo Sosa's Motion to Suppress Stop Based on Lack of Reasonable Suspicion to Conduct Investigatory Stop (Doc. 32). The Government filed its Response to Defendant's Motion to Suppress Based on Lack of Reasonable Suspicion to Conduct Investigatory Stop ("Response") (Doc. 34), and Defendant filed his Reply (Doc. 35). Defendant is charged with one count of Conspiracy to Transport Illegal Aliens for Profit in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(v)(I), 1324(a)(1)(A)(ii), and 1324(a)(1)(B)(i); and two counts of Transportation of Illegal Aliens for Profit in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(ii) and 1324(a)(1)(B)(i). Indictment (Doc. 18) at 1–2. Defendant Eduardo Sosa argues that agents lacked reasonable suspicion to stop his

vehicle, and as such seeks suppression of all evidence obtained as a result thereof.  *See* Def.'s Mot. to Suppress Stop Based on Lack of Reasonable Suspicion to Conduct Investigatory Stop (Doc. 32).

Pursuant to LRCrim. 5.1, this matter came before Magistrate Judge Macdonald for an evidentiary hearing and a report and recommendation. On July 31, 2015, an evidentiary hearing was held before Magistrate Judge Macdonald, and the matter taken under advisement.   Minute Entry 7/31/2015 (Doc. 41).   The Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's motion.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Initial Sighting*

At approximately 3:15 p.m. on January 23, 2015, United States Border Patrol Agent Eduardo Hidalgo was off-duty and returning to his home in Naco, Arizona after having lunch with his family in Bisbee, Arizona.  Hr'g Tr. 7/31/2015 (Doc. 45) 13:20–14:6.  Agent Hidalgo has been a Border Patrol agent for almost fourteen (14) years, and is currently assigned to the Douglas Station.  *Id.* at 5:16–20.  He is currently assigned to the mobile response team ("MRT") out of the Tucson Sector.  *Id.* at 6:11–14.  The MRT works in conjunction with specialty operations divisions, such as Border Patrol Tactical Unit ("BORTAC") and Border Patrol Search, Trauma, and Rescue ("BORSTAR").  *Id.* at 6:11–22.  Prior to his assignment with MRT, Agent Hidalgo was assigned for his first two and one half years at the Border Patrol station in Ajo, Arizona.  *Id.* at 8:22–9:4.

Agent Hidalgo has lived in Naco, Arizona for approximately thirty (30) years and at his current residence since approximately 2008.  Hr'g Tr. 7/31/2015 (Doc. 45) 10:2–13.  Agent Hidalgo testified that his house is approximately two and one half blocks away from the international border with Sonora, Mexico.  *Id.* at 10:23–11:15, 13:1–17.  Prior to his current residence, Agent Hidalgo lived approximately one and a half blocks south.  *Id.* at 29:18–30:5.  Agent Hidalgo testified that he has known the majority of the people that live in Naco since he was a child.  *Id.* at 30:6–9.  Agent Hidalgo described his neighborhood as residential, and stated that there are no shopping centers or restaurants in Naco.  *Id.* at 30:17–31:15.  Moreover, there is very little foot traffic in his neighborhood.  Hr'g Tr. 7/31/2015 (Doc. 45) 31:16–32:1.

Agent Hidalgo testified that as he was returning to his home on January 23, 2015, traveling southbound on Towner Avenue, he stopped at a four-way stop at the intersection of Dominguez and Towner.  *Id.* at 14:3–24.  Agent Hidalgo further testified that after the vehicle south of him cleared the intersection, he made a sharp left toward his house on Dominguez.  *Id.*  Agent Hidalgo testified that he observed two individuals standing on the southeast corner of Towner and Dominguez.  *Id.* at 16:4–24, 18:9–14, 39:5–12.  Agent Hidalgo described the men as Hispanic, wearing dark clothing, and one of them was talking on a cellular telephone.  *Id.* at 16:25–17:17.  Agent Hidalgo testified that initially the two men were just standing on the corner, but then proceeded to walk east on Dominguez.  Hr'g Tr. 7/31/2015 (Doc. 45) at 16:25–17:17.  Agent Hidalgo further testified that the individual talking on the phone appeared to be nervous, and was looking around as if he were either lost or looking for something or someone.  *Id.* at

- 3 -

17:14–24, 38:16–39:1, 42:17–44:9.  Agent Hidalgo also testified that the men did not appear to be from the area.  *Id.* at 17:14–24, 30:10–16.

Agent Hidalgo testified that he did not recognize these individuals, and based on his background in law enforcement and the fact that they were in his neighborhood, he decided to see what they were up to.  *Id.* at 17:25–18:8.  Agent Hidalgo further testified that he observed the individuals walking eastbound toward the alley between his house and his neighbor to the west, at which point he turned into his garage, which on the east side of his house.  *Id.* at 18:11–19:8, 39:23–40:5.  Agent Hidalgo testified that he initially thought that the men were looking for their vehicle, a pickup spot, or for somewhere to hide.  Hr'g Tr. 7/31/2015 (Doc. 45) 19:9–18.  Agent Hidalgo further testified that as he passed through the intersection, he observed a vehicle in the alley, at the end of his property.  *Id.*  Agent Hidalgo testified that the vehicle was a 1990's model Cavalier, gold or light brown in color, with a black hood and black wheels.  *Id.* at 19:19–20:18.  Agent Hidalgo testified that he had never seen the car before, and that he is familiar with the vehicles driven by his neighborhood.  *Id.* at 21:4–21, 25:9–16.

Agent Hidalgo testified that initially he could not see if there were any people in the vehicle, because of the darkly tinted windows; however, an individual exited the vehicle and opened the back door.  *Id.* at 21:22–22:14.  Agent Hidalgo, upon parking his vehicle in his garage, went through his house to a bathroom on the west side, and with a window overlooking the alley, where he could observe what was happening in the alley.  Hr'g Tr. 7/31/2015 (Doc. 45) 24:10–25:5, 40:6–12.  Agent Hidalgo further testified that he observed the two individuals who had been walking eastbound on Dominguez enter

- 4 -

the alley and get into the back seat of the gold Cavalier. *Id.* at 22:15–20, 25:17–24, 40:20–25. Agent Hidalgo testified that based upon his experience as a Border Patrol agent, he believed that he had just witnessed two illegal aliens load into the vehicle. *Id.* at 22:21–23:8.

Agent Hidalgo testified that once the two individuals got into the gold Cavalier, the vehicle backed up towards the north end of the alley. *Id.* at 25:17–26:26:1. Agent Hidalgo ran from the bathroom to a bay window at the front, the north side, of his home. *Id.* at 25:17–26:5. Agent Hidalgo further testified that from this vantage point he could see both east and west. Hr'g Tr. 7/31/2015 (Doc. 45) 26:3–7. Agent Hidalgo testified that he observed the gold car wait for traffic on Dominguez to clear and then watched it drive west on Dominguez through the four-way stop on Towner. *Id.* at 26:8–27:5. Agent Hidalgo also testified that at that point, he observed the vehicle make a U-turn and then turn north onto Towner Avenue. *Id.* at 27:6–15. Agent Hidalgo testified that he called the Naco Border Patrol Station's tactical operation center dispatch on his cellular telephone when he was at his bathroom window, and proceeded to report his observations, including the make and model of the vehicle, the individuals being loaded, and where the vehicle travelled until he lost sight of it as it traveled north on Towner Avenue. *Id.* at 27:16–28:12, 41:1–22.

Agent Hidalgo described the alley as approximately ten (10) to twelve (12) feet wide, unpaved, and not maintained by the city. *Id.* at 29:1–7. Agent Hidalgo stated that he maintained the portion of the alley adjacent to his home. Hr'g Tr. 7/31/2015 (Doc. 45) 28:18–25, 40:13–19. Agent Hidalgo testified that he did not see people in the alley very

- 5 -

often, because it does not provide a shortcut to anywhere in particular. *Id.* at 29:8–11. Furthermore, the only vehicles that he has observed in the alley previously were Arizona Public Service or Southwest Gas vehicles reading meters. *Id.* at 29:12–17.

### B. Dispatch of Agents

On January 23, 2015, United States Border Patrol Agent Sean Dorsey was on duty with his partner at the time, Jesus Verdugo. *Id.* at 47:25–48:12. Agent Dorsey has been a Border Patrol agent for approximately seven and one half (7 1/2) years. *Id.* at 46:1–4. He is assigned to the Brian Terry/Naco Station Disrupt Unit. Hr'g Tr. 7/31/2015 (Doc. 45) 46:12–17. Agent Dorsey described the disrupt unit's function as utilizing Border Patrol agents in plainclothes and unmarked service vehicles to disrupt smuggling organizations, both human and narcotic smuggling, that work within the area of responsibility. *Id.* at 46:18–47:2. The Naco Station's area of responsibility is from the Huachuca Mountains and borders the Douglas Station's area of responsibility, just west of Douglas, Arizona. *Id.* 47:5–10. Agent Dorsey testified that typically his focus is the area around Bisbee and Naco. *Id.* at 47:11–15.

Agent Jesus Verdugo has worked for the United States Border Patrol for approximately fourteen and one half (14 1/2) years. *Id.* at 87:12–24. Agent Verdugo has been assigned to the Brian Terry Border Patrol Station for the entirety of his career, and was a member of the Disrupt Unit on the date in question. Hr'g Tr. 7/31/2015 (Doc. 45) 88:2–21. Agent Verdugo described the Naco Station's area of responsibility, similarly to Agent Dorsey, with its primary focus around Naco and Bisbee. *Id.* at 88:22–89:5.

On January 23, 2015 at approximately 3:40 p.m., Agent Dorsey received a call

from dispatch. *Id.* at 48:22–25. Agent Dorsey said that Border Patrol generally sees more activity during this time of day, because it correlates to the agents' shift change, a time when they are coming back from the field to the station and vice-versa. *Id.* at 49:1–14, 78:9–17. Agent Verdugo's testimony confirmed that smuggling activity increases during the shift change. *Id.* at 89:22–92:11. Agents Dorsey and Verdugo testified that dispatch informed them that an off-duty Border Patrol agent stated that he had seen what he believed to be two illegal aliens enter a vehicle on West Dominguez Street in Naco, and then traveled north on Towner Avenue. Hr'g Tr. 7/31/2015 (Doc. 45) 51:14–22, 92:12–19. Agents Dorsey and Verdugo further testified that dispatch described the vehicle as a gold Chevy Cavalier, with a black front end and black wheels. *Id.* at 52:5–7, 92:12–19. Agents Dorsey and Verdugo testified that dispatch did not give the name of the agent who had made the call, but that he assumed it was an agent that he knew lived on Dominguez Street in Naco. *Id.* at 52:8–15, 66:11–23, 93:4–12. Agent Dorsey testified that he is familiar with the location of the agent's home, and that it is approximately two (2) blocks from the international border. *Id.* at 66:11–23. Agents Dorsey and Verdugo's descriptions of the alley were consistent with that of Agent Hidalgo's, as was their general description of Naco. *Id.* at 66:24–68:24, 111:9–113:21. Additionally, Agent Dorsey testified that he had encountered illegal aliens in many of Naco's alleyways. Hr'g Tr. 7/31/2015 (Doc. 45) 69:13–70:19. Agent Dorsey further testified that he was aware, through radio traffic, observation, or personal involvement, of other Border Patrol agents arresting illegal aliens in the Naco area. *Id.* at 70:20–71:8. Agent Verdugo also testified that he had many encounters with illegal aliens in Naco. *Id.*

at 113:24–118:3.

Agents Dorsey and Verdugo also testified that because it was an off-duty Border Patrol agent who reported the activity was significant, because such an individual is a trained, law enforcement officer who works specifically with immigration law and smuggling.  *Id.* at 51:23–52:4, 92:20–93:3.  Agent Dorsey testified that when he received the call from dispatch, he was on State Route 92, on the west end of the Bisbee city limits, approximately three (3) miles from the West Dominguez Street address.  *Id.* at 52:16–21.  Agent Dorsey testified consistently with Agent Dorsey.  Hr'g Tr. 7/31/2015 (Doc. 45) 93:13–21.

### C. Initial Agent Contact

Agent Dorsey and Agent Verdugo testified that upon receiving the call from dispatch, they traveled to the intersection of State Route 92 and Naco Highway.  *Id.* at 52:22–24, 93:19–21.  Agent Dorsey further testified that there are only a few egress routes from the Naco area to State Routes 92 and 80, and in his experience the location at Naco Highway is frequently used for smuggling vehicles.  *Id.* at 54:21–55:1.  Agent Dorsey believes that this is because it is the most well-traveled route, and smuggling vehicles are more likely to blend in with the normal traffic.  *Id.* at 54:21–55:1, 79:16–22.  Agent Verdugo confirmed that Naco highway is the most common route for traffic leaving the Naco area.  *Id.* at 96:11–14.  Agents Dorsey and Verdugo testified that they were at the intersection for a minute or two, and then heard over the radio that agents had spotted the vehicle described by the off-duty agent traveling northbound on Naco Highway.  Hr'g Tr. 7/31/2015 (Doc. 45) 55:2–12, 96:15–20, 99:14–100:21.  Agents

- 8 -

Dorsey and Verdugo further testified that within another minute, they observed the gold Chevy Cavalier with black hood, fenders and black rims described by dispatch and the other agents. *Id.* at 55:13–21, 79:23–25, 96:22–24, 99:14–100:21.

Agent Dorsey testified that he is familiar with the majority of the traffic that regularly travels in the Naco/Bisbee area, because it is such a small community. *Id.* at 56:7–18. Agent Dorsey stated that he had never seen the vehicle in question before, and because it was quite distinct, he would have noticed it if he had seen it previously. *Id.* Agent Verdugo also testified that he was positive that the vehicle they observed was the same as that which had been described by dispatch. *Id.* at 97:8–19. Agent Verdugo further testified that he had never seen it before in the Naco area, and it is part of his daily responsibility to patrol Naco, and as such he is familiar with the cars regularly in the area. Hr'g Tr. 7/31/2015 (Doc. 45) 97:8–98:20. Agents Dorsey and Verdugo confirmed that the amount of time that it took for the vehicle to travel from the West Dominguez location to the intersection of State Route 92 and Naco Highway was consistent with what they would expect based upon their knowledge of the area. *Id.* at 56:19–24, 96:25–97:7.

Once Agents Dorsey and Verdugo spotted the vehicle, it signaled and turned eastbound onto State Route 92, and they began to follow it at a safe distance. *Id.* at 56:25–57:6, 100:25–101:11. Agent Dorsey noticed that the vehicle was driving slower than the vehicles around it, and testified that he had to slow down significantly to prevent coming up right behind it and alerting the passengers to his presence. *Id.* at 57:7–14, 79:16–22, 80:1–81:23. Agent Verdugo also testified that the vehicle was traveling under

the speed limit.  *Id.* at 102:14–23.  Agent Dorsey testified that drivers will often go slower than the vehicles around them when involved in criminal activity.  Hr'g Tr. 7/31/2015 (Doc. 45) 57:15–58:1.  In this case, the driver was operating the vehicle approximately five (5) or ten (10) miles under the posted speed limit.  *Id.*

Agent Dorsey testified that Agent Verdugo called their supervisor, Agent Mendoz, who ran a vehicle registration check.  *Id.* at 58:7–15.  The vehicle was registered to a female individual out of Phoenix, Arizona.  *Id.* at 58:7–15, 101:19–23.  Agents Dorsey and Verdugo further testified that they found this significant, because the majority of vehicles that Border Patrol encounters, particularly in alien smuggling cases, are registered in the Phoenix metropolitan area, which is approximately three and one half (3 1/2) to four (4) hours away.  *Id.* at 58:16–25, 101:24–102:9.

Agents Dorsey and Verdugo followed the vehicle east on State Route 92 through the Bisbee traffic circle, and onto State Route 80.  Hr'g Tr. 7/31/2015 (Doc. 45) 59:1–23, 101:7–14, 102:10–13.  Agent Dorsey testified that at the time there was no Border Patrol checkpoint located on State Route 80.  *Id.* at 59:1–23, 74:20–23, 76:12–14.  Agent Dorsey further testified that he was aware of Border Patrol agents working out of the Lordsburg, New Mexico station encountering alien smuggling vehicles traveling east on State Route 80.  *Id.* at 59:14–60:1.  Agent Dorsey also testified that he had participated in the apprehension of a vehicle containing illegal aliens approximately three (3) weeks prior to the incident in this case.  *Id.* at 60:2–10.  Agents Dorsey and Verdugo testified that they were also aware of similar incidents of alien smuggling loads being encountered on State Route 80 East by Border Patrol out of the Naco and Douglas stations.  *Id.* at

60:19–61:4, 108:4–10.   Agent Dorsey further testified that this information is usually disseminated through interviews and then through intelligence agents throughout the different stations.   Hr'g Tr. 7/31/2015 (Doc. 45) 61:5–15.   Agent Verdugo also testified about the trend of smuggling vehicles taking the Highway 80 route out of Naco.   *Id.* at 103:24–104:4, 105:3–10.

### D. The Stop

Once on State Route 80, Agent Dorsey followed the vehicle passed Double Adobe Road.   *Id.* at 61:16–20.   Agent Dorsey identified the factors he considered relevant to reasonable suspicion as 1) a Border Patrol agent had noticed two individuals in a highly active smuggling area; 2) he observed the suspect vehicle in the time that it would have taken it to travel from the original location to him; 3) the vehicle was driving slower than the other vehicles on the road; and 4) the vehicle was registered to a person out of Phoenix.   *Id.* at 62:13–63:4, 82:4–13.   Agent Verdugo concurred with these factors, but also included 1) the fact that the station camera had picked up the vehicle traveling northbound out of Naco; and 2) that the incident was occurring during shift change.   *Id.* at 109:14–110:8, 123:8–13.   Agent Verdugo testified that they radioed to see if there were any marked Border Patrol vehicles available to make the stop, but there were none.   Hr'g Tr. 7/31/2015 (Doc. 45) 108:11–109:8.   As such, Agent Dorsey informed agents at the Brian Terry Station that they were conducting a multiple-agent vehicle stop.   *Id.* at 63:5–14, 110:9–19.

Agent Dorsey testified that the vehicle yielded, pulled off to the side of the highway, and he approached on the driver's side as Agent Verdugo approached on the

passenger side.  *Id.* at 63:5–14.  Agent Verdugo testified consistently with Agent Dorsey. *Id.* at 110:9–19   Agent Dorsey further testified that as he approached the vehicle, the driver had his window down, his hands were visibly shaking, and Agent Dorsey observed the driver's pulse beating in his neck.  *Id.* at 63:15–23.  Agents Dorsey and Verdugo identified the driver as Defendant Eduardo Sosa.  Hr'g Tr. 7/31/2015 (Doc. 45) 643:24–64:5, 111:3–8.  Agent Dorsey testified that he also observed a passenger in the front-seat, as well as two individuals in the back seat.  *Id.* at 64:6–15.  Agent Dorsey described the two individuals in the back seat as having dirt on their skin and clothing, and wearing multiple layers of clothing.  *Id.* at 64:16–22.  Agent Dorsey associated the appearance of the back seat passengers as consistent with prior encounters with illegal aliens, who are often dirty, because they have been traveling in the desert, and wearing multiple layers of clothing so they do not have to pack it.  *See id.* at 64:16–65:3.

## II.    ANALYSIS

Defendant seeks suppression of all evidence and statements, because they were allegedly obtained as a result of stop lacking reasonable suspicion, and which was therefore unlawful.  *See* Def.'s Mot. to Suppress Based on Lack of Reasonable Suspicion to Conduct Investigatory Stop, (Doc. 32).

### A.  Search and Seizure—In General

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct.

744, 750, 151 L.Ed.2d 740 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). For the police to conduct a valid stop, they must "have a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (internal quotes and citation omitted). "[T]he level of suspicion required for a *Terry* stop[, however,] is obviously less demanding than that for probable cause." *Id.* at 8, 109 S.Ct. at 1585 (internal citations omitted). "Officers on roving border patrols . . . may conduct 'brief investigatory stops' without violating the Fourth Amendment 'if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot.'" *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc) (citations omitted).

### B. The Collective Knowledge Doctrine

The parties disagree regarding the applicability of the collective knowledge doctrine in this case. The accepted practice of modern law enforcement is that an officer often makes arrests at the direction of another law enforcement officer even though the arresting officer himself lacks actual, personal knowledge of the facts supporting probable cause or reasonable suspicion. *United States v. Butler,* 74 F.3d 916, 921 (9th Cir.1996); *see also United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) (police officers entitled to rely on radio bulletins based on reasonable suspicion of other officers). Under the collective knowledge doctrine, we "look to the collective knowledge of all the officers involved in the criminal investigation although all

of the information known to the law enforcement officers involved in the investigation is not communicated to the officers who actually makes the stop." *U.S. v. Sutton*, 794 F.2d 1415, 1426 (9th Cir. 1986). "The rule exists because, in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superior or associates." *United States v. Ramirez*, 473 F.3d 1026, 1037 (9th Cir. 2007) (citations omitted).

The Ninth Circuit Court of Appeals has recognized that the collective knowledge doctrine is applicable "in at least two situations:" (1) "where law enforcement agents are working together in an investigation but have not explicitly communicated the facts each has independently learned;" and (2) "where an officer (or team of officers), with direct personal knowledge of all the facts necessary to give rise to reasonable suspicion or probable cause, directs or requests that another officer, not previously involved in the investigation, conduct a stop, search, or arrest." *Ramirez*, 473 F.3d at 1032-33; *see also United States v. Villasenor*, 608 F.3d 467, 475 (9th Cir. 2010). Whether a law enforcement officer is on- or off-duty is of no moment to the applicability of this doctrine. *See e.g., United States v. Acuna*, 2008 WL 1836795 (D. Ariz. 2008) (initial information of suspicious reported by off-duty police communications dispatcher and transmitted to other officers who ultimately arrested the defendants); *United States v. Wheeler*, 800 F.2d 100 (7th Cir. 1986) (off-duty police officer reported potentially armed and dangerous individuals in a bar, under the collective knowledge doctrine the information known to him was sufficient to support reasonable suspicion for a stop and

frisk), *overruled on other grounds by United States v. Sblendorio*, 830 F.2d 1382 (7th Cir. 1987).

In the instant case, Agent Hidalgo, a fourteen (14) year veteran of the United States Border Patrol, and life-long resident of Naco, Arizona, personally observed two Hispanic males, one of whom was talking on a cellular telephone, who appeared lost and looking around for something or someone.  Hr'g Tr. 7/31/2015 (Doc. 45) 5:16–20, 6:11–22, 10:2–13, 14:3–24, 16:4–17:24, 18:9–14, 39:5–12, 38:16–39:1, 42:17–44:9.  Agent Hidalgo testified that he did not recognize the individuals, and observed them walking toward the alley behind his home, which is approximately two and one half (2 1/2) blocks from the international border.  *Id.* at 10:23–11:15, 13:1–17, 17:25–19:8, 39:23–40:5.  Agent Hidalgo watched the individuals get into the back of a 1990's model, gold, Chevy Cavalier with a black hood and black wheels, which he had never seen before, and that was parked in the alley.  *Id.* at 19:19–20:18, 21:4–21, 22:15–23:8, 25:9–24, 40:20–25.  Agent Hidalgo testified that the only vehicles that he had seen in the alley previously were utility company service vehicles.  *Id.* at 29:12–17.  Agent Hidalgo believed that he had witnessed two illegal aliens load into the vehicle.  *Id.* at 22:21–23:8.  Agent Hidalgo then observed the gold car drive west on Dominguez through the four-way intersection on Towner Avenue, make a U-turn, and then head north on Towner, suggesting that the driver was not familiar with the area. *See U.S. v. Diaz-Juarez*, 299 F.3d 1138, 1142 (9th Cir. 2002) (one fact supporting reasonable suspicion was the vehicle "slowing and speeding in a manner consistent with a driver who did not know the area").  Agent Hidalgo communicated this information to the Naco Border Patrol Station's dispatch in

- 15 -

real time.  Hr'g Tr. 7/31/2015 (Doc. 45) 27:16–28:12, 41:1–22.

The Court finds Agent Hidalgo's testimony credible.  Agent Hidalgo's personal observations of the events in close proximity to the international border, as well as his experience in law enforcement were sufficient "articulable facts" to suggest "criminal activity may be afoot."  *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (internal quotes and citation omitted).  This alone was reasonable suspicion for the stop, and the information was communicated to dispatch, and passed on to agents in the field.  Hr'g Tr. 7/31/2015 (Doc. 45) 48:22–25, 51:14–22, 52:5–7, 92:12–19.  In such a circumstance, the information may be relied on by the arresting officers under the collective knowledge doctrine.  *See United States v. Mayo*, 394 F.3d 1271, 1275 n.7 (9th Cir. 2005) (reasonable suspicion to support a stop even where dispatch did not transmit all the facts to the officer making the stop).

### C. Reasonable Suspicion

"Reasonable suspicion is defined as 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* (quoting *United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013) (en banc)).  "The reasonable-suspicion standard is not a particularly high threshold to reach." *Valdes-Vega*, 738 F.3d at 1078.  Furthermore, although "a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* (quoting *Arvizu*, 534 U.S. at 274, 122 S.Ct. 744) (citations and internal quotation marks omitted).

When making a reasonable-suspicion determination, the reviewing court "must

look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273 (citations omitted); *see also United States. v. Alvarez*, 899 F.2d 833, 836 (9th Cir. 1990). In so doing, officers are allowed "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* at 273, 122 S.Ct. at 750-51. (citations omitted); *see also Valdes-Vega*, 738 F.3d at 1078. Moreover, what may seem to be innocuous conduct when viewed in isolation may be appropriately considered when considering the totality of the circumstances; thus, it is inappropriate to view factors in isolation and to give no weight to factors which may have an innocent explanation. *Arvizu*, 534 U.S. at 273-75, 122 S.Ct. at 750-51; *see also Cotterman*, 709 F.3d at 970 ("It is not our province to nitpick the factors in isolation but instead to view them in the totality of the circumstances."). Furthermore, "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Valdes-Vega*, 738 F.3d at 1078-79 (citing *Arvizu*, 534 U.S. at 277) (alterations in original).

"In the context of border patrol stops, the totality of the circumstances may include characteristics of the area, proximity to the border, usual patterns of traffic and time of day, previous alien or drug smuggling in the area, behavior of the driver, appearance or behavior of passengers, and the model and appearance of the vehicle." *Valdes-Vega*, 738 F.3d at 1079 (citing *United States v. Bignoni-Ponce*, 422 U.S. 873, 884-85, 95 S.Ct. 2574, 45 L.Ed.2d 607(1975)). "Not all of these factors must be present or highly

probative in every case to justify reasonable suspicion[,] . . . [a]nd the facts must be filtered through the lens of the agents' training and experience." *Valdes-Vega*, 738 F.3d at 1079 (citations omitted).

Here, Agent Dorsey is a seven and one half (7 1/2) year veteran of Border Patrol, and his partner, Agent Verdugo, has been an agent for fourteen and one half (14 1/2) years. Hr'g Tr. 7/31/2015 (Doc. 45) 87:12–24, 88:2–21. Agents Dorsey and Verdugo testified that dispatch informed them that an off-duty Border Patrol agent stated that he had seen what he believed to be two illegal aliens enter a vehicle on West Dominguez Street in Naco, and then traveled north on Towner Avenue. Hr'g Tr. 7/31/2015 (Doc. 45) 51:14–22, 92:12–19. Agents Dorsey and Verdugo further testified that dispatch described the vehicle as a gold Chevy Cavalier, with a black front end and black wheels. *Id.* at 52:5–7, 92:12–19. Both agents testified that they were aware that Naco is a small residential area, in close proximity to the international border. *Id.* at 66:11–68:24,, 69:13–71:8, 111:9–118:3. Additionally, both agents found it significant that the call came in during the shift change, a time when there is more activity generally, and an increase in smuggling activity specifically, because agents are coming and going from the positions in the field. *Id.* at 49:1–14, 78:9–17, 89:22–92:11. Both agents testified that they had not seen the vehicle before, and expressed familiarity with the majority of vehicles that travel regularly in and around Naco. *Id.* at 56:7–18, 97:8–98:20. They further testified that the vehicle passed their location in the time it would have taken to travel from its original location, and where the station camera had picked it up on Towner Avenue. *Id.* at 55:2–21, 62:13–63:4, 79:23–25, 82:4–13, 96:15–24, 99:14–100:21,

109:14–110:9, 123:8–13.   The agents further testified that the vehicle was traveling slower than other vehicles on the road, and was registered in Phoenix, Arizona—in the agents' experience the majority of vehicles in alien smuggling cases are registered in Phoenix and often drive more slowly.  *Id.* at 57:7–58:15, 79:16–22, 80:1–81:23, 101:19–102:23.  The agents further testified that there is no Border Patrol checkpoint located on State Route 80, and that alien smuggling loads were being encountered in that area.  *Id.* at 60:19–61:15, 103:24–104:4, 105:3–10, 108:4–10.

The Court finds Agents Dorsey and Verdugo's testimony credible.  Based upon the totality of the circumstances, there was reasonable suspicion for the agents to stop the vehicle.  This is true whether Agent Hidalgo's personal observations are included based upon the collective knowledge of all the officers, or solely upon Agents Dorsey and Verdugo's personal knowledge coupled with the information transmitted to them by dispatch.  The agents provided specific articulable facts to suspect criminal activity sufficient to support reasonable suspicion justifying the stop.

## III.    CONCLUSION

The Court finds that reasonable suspicion supported the stop of Defendant.  As such, the stop was constitutional, and the motion to suppress should be denied.

## IV.    RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court DENY Defendant Eduardo Sosa's Motion to Suppress Based on Lack of

Reasonable Suspicion to Conduct Investigatory Stop (Doc. 32).

Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.  No reply shall be filed unless leave is granted from the District Court.  If objections are filed, the parties should use the following case number: **CR-15-0313-TUC-RM**.

Failure to file timely objections to any factual or legal determination of the Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right of review.

Dated this 3rd day of September, 2015.

Honorable Bruce G. Macdonald
United States Magistrate Judge