IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                Plaintiff,<br><br>v.<br><br>Eduardo Sosa,<br><br>                Defendant. | No. CR-15-00313-001-TUC-RM<br><br>**ORDER** |

Pending before the Court is a Report and Recommendation (Doc. 48) issued by United States Magistrate Judge Bruce Macdonald (Doc. 32). In the Report and Recommendation, Judge Macdonald recommends that this Court deny Defendant's Motion to Suppress (Doc. 23) after finding that there was reasonable suspicion to justify the January 23, 2015 investigatory stop that lead to Defendant's arrest. Defendant objects and argues that the Border Patrol Agents involved lacked the necessary objective facts to reasonably suspect him of any criminal conduct.

*I.* *Background*

Judge Macdonald held a hearing on Defendant's Motion to Suppress on July 31, 2015. Border Patrol Agents Eduardo Hidalgo, Sean Dorsey, and Jesus Verdugo testified as follows.

On January 23, 2015 at approximately 3:15 p.m., Agent Hidalgo was off-duty from his post in Douglas, Arizona and was driving to his home in the city of Naco, Arizona. Each of the agents testified that Naco is a particularly small border city. Agents

1 Dorsey and Verdugo stated that it takes one to two minutes to drive through the entire
2 city. Naco is almost entirely residential and both Agents Hidalgo and Verdugo testified
3 that aside from school children walking to and from home, there was very little foot
4 traffic. When asked if he witnessed frequent foot traffic in Naco, Agent Dorsey testified
5 that outside of the many undocumented immigrants he has seen, he has witnessed only
6 occasional foot traffic. Agent Hidalgo testified that there are no sidewalks.

7 Agent Hidalgo has lived in Naco for thirty years and knows all of his neighbors.
8 Agents Dorsey and Verdugo have been stationed in Naco for over seven and fourteen
9 years, respectively. Each agent testified that Agent Hidalgo's neighborhood, which is
10 just a few blocks from the international border, has high incidents of human and narcotic
11 smuggling. Agent Hidalgo had not personally witnessed any undocumented immigrants
12 in Naco before the day in question. Border Patrol Agents Dorsey and Verdugo testified
13 that there have been numerous occasions on which they have intercepted illegal
14 immigrants in Naco. Agent Verdugo in particular listed several interceptions of
15 smuggling activity directly in front of, in the alley directly adjacent to, and in various
16 places in the two-block radius surrounding Agent Hidalgo's home.

17 As Agent Hidalgo was preparing to turn onto his block on January 23, 2015, he
18 noticed two men who were standing on the corner looking around for something or
19 someone. Agent Hidalgo did not recognize either man. One of the men was talking into
20 a cell phone and both men were visibly in search of something. When Agent Hidalgo
21 turned onto his street and proceeded into his garage, the men were walking east on
22 Dominquez Street towards an alley next to Agent Hidalgo's house.

23 Agent Hidalgo testified that the men's actions made him suspicious because it was
24 unusual to see strangers walking around in his neighborhood and, given their apparent
25 search and Agent Hidalgo's knowledge of common practices of human smugglers, it
26 appeared possible that the men might be looking for a pick-up spot as part of a smuggling
27 operation. Specifically, Agent Hidalgo testified that smugglers often directed
28 undocumented immigrants by telephone to a car or person who is to provide them

transportation on the next stage of their journey.

Because of these reasons, Agent Hidalgo called the Border Patrol dispatch upon entering his house and alerted them that he believed he might be witnessing two undocumented immigrants in the middle of a smuggling operation. Agent Hidalgo went into his bathroom where a window overlooked the alley, and he saw the two men get into the back seat of a distinctive gold and black car.

The alley next to Agent Hidalgo's house is unpaved and is not maintained by the city. Agent Hidalgo testified that he maintains the alley by mowing the grass because he has a swingset in the alley that his children use. Agents Dorsey and Verdugo testified that they do not usually see cars in the alley, and Agent Hidalgo testified that the only cars he had previously seen were utility vehicles checking various meters for the neighboring houses. Agents Hidalgo and Dorsey testified that they had not seen individuals walking in the alley in the past. Agent Verdugo testified that he has previously found illegal immigrants there.

Agent Hidalgo testified that he told the Border Patrol dispatch that he believed he had just witnessed two illegal immigrants load into the back seat of a black and gold 1990s model Cavalier. He also relayed that as he was speaking, the car was backing out of the alley and subsequently turned onto Dominquez Street, crossed Towner Avenue, made a U-turn, and then turned North onto Towner Avenue. Dispatch thereafter issued an alert that an off-duty border patrol agent witnessed two individuals who he believed were undocumented immigrants enter a black and gold 1990s Cavalier on West Dominguez Street and that the car was then seen traveling North on Towner.

Agents Dorsey and Verdugo, who are both members of the Disrupt Unit, heard the call from dispatch at approximately 3:40 p.m. The Disrupt Unit uses border patrol agents in plainclothes and unmarked cars to investigate and intercept illegal smuggling operations. Both Agents testified that the timing of this tip was significant because it was right before the Patrol Unit's next shift change. They testified that smuggling operations attempt to time their actions to limit the likelihood of detection, in particular by moving

1  individuals during and around the Patrol Unit's change in shifts. The theory is that as
2  agents are moving off and into the field, they are paying less attention to those around
3  them.  Agents Dorsey and Verdugo have found over the years that smuggling activity
4  tends to increase when one patrol shift is ending and another is beginning.
5       In response to the dispatch call, Agents Dorsey and Verdugo drove to the
6  intersection of Route 92 and Naco Highway. They chose this location because, of the
7  few routes out of Naco, it is the one most frequently used by smuggling operations. After
8  hearing that a vehicle matching the description had been sighted by the Border Patrol's
9  remote surveillance, the agents saw the suspected vehicle. While both agents spend their
10 days in the small Naco area, neither had seen the car before.
11      The agents followed the car as it turned eastbound on Route 92. While they were
12 following the vehicle, the agents ran the license plate and determined that the car was
13 registered to a female in Phoenix. Each agent testified that this was significant because
14 the majority of human smugglers use cars that are registered out of Phoenix. Agent
15 Verdugo in particular testified that more than 80% of the smugglers he has encountered
16 were operating out of a Phoenix-registered vehicle.
17      The agents also noticed that the car was driving somewhat under the speed limit,
18 such that several cars passed it, and the agents themselves had to make an effort to slow
19 down to avoid detection. Both agents testified that this raised their suspicions because
20 smugglers often drive more slowly than necessary in order to avoid detection by law
21 enforcement.
22      The vehicle subsequently approached a traffic circle and turned eastbound onto
23 Route 80. Both agents found this to be significant because Route 80 does not have any
24 Border Patrol checkpoints until New Mexico. Smugglers therefore frequently use this
25 route to go east into New Mexico, and then turn onto I-10—before reaching the first New
26 Mexico checkpoint—to come back west and north to Phoenix. By doing so, smugglers
27 add an otherwise unnecessary two hours to their trek to Phoenix, but are able to avoid any
28 checkpoints.

After following the car eastbound for some distance on Route 80, Agents Dorsey and Verdugo evaluated whether they had enough reasonable suspicion to warrant a stop. Believing that they did, the agents stopped the car. When asked to identify what factors he considered when determining whether there was reasonable suspicion for a stop, Agent Dorsey listed the following facts: (1) a border patrol agent saw the individuals in a "highly active smuggling area"; (2) Agent Dorsey witnessed the car in the amount of time it would take to travel from Dominguez and Towner intersection to his location; (3) the car was driving more slowly than those cars around it; (4) the car was registered out of Phoenix; and (5) the car took Route 80 East. When presented with the same question, Agent Verdugo listed (1) the tip from the off-duty Border Patrol Agent; (2) the description the off-duty agent provided; (3) Border Patrol Surveillance's visual of the car as it traveled between the off-duty agent's location and that of Agents Dorsey and Verdugo; (4) the route the car took; (5) the time of day, specifically that it was during a typical shift change amongst the Border Patrol; and (6) "a little bit" that the car was moving more slowly than normal.

## II.     Analysis

Courts determine if there was reasonable suspicion for an investigatory stop by considering whether, based on the totality of the circumstances, officers had a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013) (internal citations omitted). When challenging a stop, a defendant must not "attempt to discredit individually each of the facts used by agents to determine if there was reasonable suspicion" because such a "divide-and-conquer analysis" is prohibited by the Supreme Court's opinion in *United States v. Arvizu*, 534 U.S. 266 (2002). *United States v. Palos-Marquez*, 591 F.3d 1272 (9th Cir. 2010). Instead, a defendant can be successful at challenging an investigatory stop if he demonstrates that, considering all of the facts available to the agents, there is insufficient "particularized and objective" bases for the stop.

Defendant here does just what *Arvizu* prohibits: he challenges the credibility of each individual factor considered by the agents. When this Court considers the whole of the situation known to the agents, it is apparent that there are sufficient objective, particularized facts to support the stop. Agents Dorsey and Verdugo knew the following facts:[1] two unfamiliar men were seen walking in a town less than one minute from the international border, in which there is little to no foot traffic and nearly everyone knows everyone else. The men's conduct was suspicious such that a trained border patrol agent noticed them and came to the conclusion that they might be illegal immigrants.[2] The area in which the men were seen has a high incidence of illegal immigration, evidenced not solely by its proximity to the border but by the agents' years of experience working and arresting undocumented immigrants therein. The two men got into a car that was registered out of Phoenix, Arizona, over two hundred miles away, where upwards of 80% of Agent Verdugo's intercepted smuggling vehicles were registered.[3] The men thereafter traveled on a route that the then-current smuggling operations used in order to avoid detection at Border Patrol checkpoints. Additionally, the men drove noticeably more

---

[1] This includes both those facts that Agents Dorsey and Verdugo personally knew, as well as those imputed to them by way of the collective knowledge doctrine. Defendants did not object to the Report and Recommendation's finding that this doctrine applied, and this Court, finding no error in that conclusion, adopts that finding.

[2] Defendant argues that Agents Dorsey and Verdugo placed improper weight on the fact that the initial tip came from a fellow Border Patrol Agent who they knew. The Ninth Circuit has consistently stated that knowledge of the tipster enhances the reliability of the tip received and is properly considered when determining if there is sufficient suspicion to conduct a stop. *See, e.g. United States v. Fernandez-Castillo*, 324 F.3d 1114, 1117-18 ("Most significantly, the report of erratic driving came from a known source").

[3] Defendant would have this Court hold that this factor should not be considered because it is an overbroad generalization, citing *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1124 (9th Cir. 2001). The court in *Sigmond-Ballesteros* faced a different set of facts than that here. In *Sigmond-Ballesteros*, there was no testimony to support the contested factor, specifically that Highway 86 is "notorious" for smuggling and that activity increases when the checkpoints are closed. Here, however, two Border Patrol agents with a combined twenty-one years of experience testified that the large majority of smuggling interceptions conducted in Naco involved cars registered out of Phoenix, and the Ninth Circuit has held that such evidence may sustain an objection to the presence of reasonable suspicion. *See, e.g.*, *United States v. Diaz-Juarez*, 299 F.3d 1138, 1142 (9th Cir. 2013) (accepting as part of a reasonable suspicion calculus that car was registered out of the area).

1 slowly than the speed limit and the surrounding traffic.[4]  This all occurred during a time
2 when smuggling activity increases because Border Patrol agents are in the process of
3 changing shifts and are therefore less focused on apprehending suspects.[5]  The Ninth
4 Circuit has consistently held that such facts adequately support a finding of reasonable
5 suspicion, and this Court finds no error in Judge Macdonald's adherence to such case
6 law.  Accordingly,

. . .

. . .

. . .

. . .

. . .

. . .

. . .

---

[4] Defendant argues that the speed of the car cannot be used in the reasonable suspicion calculus because it creates a "damned if you do, damned if you don't" situation. However, of the cases that Defendant cites for this proposition, only one reflects the law of the circuit and it involved the very different circumstance involving the effects that conspicuous law enforcement presence has on the drivers. *See, e.g.*, *Sigmond-Ballesteros*, 285 F.3d at 1120 (considering that it was reasonable for a driver to slow down after a Border Patrol agent shone one of the lights mounted on top of his Ford Expedition into the driver's car).  The key fact is that any rational person who is not engaging in criminal activity would reasonably reduce their speed in the presence of law enforcement.  Where, as here, the law enforcement officers are in plainclothes and unmarked cars, their presence is not obvious and the principles Defendant argues do not apply.  Defendant's remaining authorities are not binding because they were either overturned, *see United States v. Valdes-Vega*, 685 F.3d 1138 (9th Cir. 2012), *rev'd en banc*, 738 F.3d 1074 (on rehearing en banc the court considered the speed of the driver and found that there was reasonable suspicion), or stated only in a dissenting opinion, *see Diaz-Juarez*, 299 F.3d at 1148 (9th Cir. 2002) (Judge Ferguson dissenting to majority's conclusion that there was sufficient reasonable suspicion).

[5] Defendant demands that such a fact cannot be considered unless there is "statistical data provided."  Defendant provides no citation to support such a demand, and the case law this Court has reviewed indicates that such evidence is not necessary. *See, e.g.*, *Fernandez-Castillo*, 324 F.3d at 1120 (listing with approval inference drawn by a police officer based upon his professional experience—specifically that the suspect might have been driving impaired because he was sitting very close to the steering wheel, "a behavior that [the officer] knew was typical of impaired drivers."); *see also Illinois v. Gates*, 462 U.S. 213, 232 (1983) (court's review of evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.").

1  **IT IS HEREBY ORDERED** that Defendant's Objections (Doc. 58) to the Report and Recommendation are **overruled**.

**IT IS FURTHER ORDERED** that Judge Macdonald's Report and Recommendation (Doc. 48) is **accepted and adopted**. Defendant's Motion to Suppress (Doc. 32) is **denied**.

Dated this 14th day of December, 2015.

_____
Honorable Rosemary Marquez
United States District Judge